ANTHONY AND CAROL MARRONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marrone v. Commissioner
Docket No. 14152-92
United States Tax Court
T.C. Memo 1995-22; 1995 Tax Ct. Memo LEXIS 23; 69 T.C.M. (CCH) 1684; January 18, 1995, Filed *23 Decision will be entered under Rule 155. For petitioners: D. Victor Pellegrino. For respondent: Matthew I. Root. DAWSON, PAJAK
DAWSON
MEMORANDUM OPINION DAWSON, Judge: This case was assigned to Special Trial Judge John J. Pajak pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. All section numbers refer to the Internal Revenue Code for the taxable years in issue. All Rule numbers refer to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PAJAK, Special Trial Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6661
Sec. 6663(a)
1988
$ 18,467
$ 13,850
$ 4,617
-- 1989
2,702
-- -- $ 2,026
1990
17,916
-- -- 13,437
After a concession by respondent, the Court must decide: (1) Whether petitioners understated their taxable income in 1988, 1989, and 1990; (2) whether petitioners are liable for additions to tax for fraud under section 6653(b)(1) for 1988 and under section 6663(a) for 1989 *24 and 1990; and (3) whether petitioners are liable for an addition to tax under section 6661 for a substantial understatement of tax for 1988. For clarity and convenience our findings of fact and opinion are combined. Some of the facts in the case have been stipulated and are so found. Petitioners resided in Utica, New York, at the time they filed their petition. Anthony Marrone (petitioner) worked for the City of Utica, Department of Public Works, as a supervisor during the years in issue and became the first deputy commissioner by April 1989. He reported earnings in the amounts of $ 29,089.01, $ 27,563.98, and $ 27,930.42 in 1988, 1989, and 1990, respectively. Carol Marrone (Mrs. Marrone) was employed by a labor union during the years in issue. She was a claims processor in 1988 and became an assistant supervisor by February 1990. She reported earnings in the amounts of $ 20,107.06, $ 20,507.21, and $ 28,536 in 1988, 1989, and 1990, respectively. Petitioners reported total income on their 1988, 1989, and 1990 Federal income tax returns in the amounts of $ 51,097.32, $ 50,906.19, and $ 60,197.67, respectively. Respondent determined that petitioners had expenditures in excess *25 of reported sources of income in the amounts of $ 60,588, $ 9,632, and $ 59,192 for the years 1988, 1989, and 1990, respectively. Petitioners claimed that they had several sources of funds which were not taxable income, and that respondent did not take these funds into account. Petitioners asserted that they had money from cash gifts and cash loans that they spent during the years at issue. (The use of the words "gift" or "loan" is for convenience.) Respondent conceded that the determination of income for 1988 was overstated by $ 20,000. Alleged Cash Gifts of $ 70,000
Mrs. Marrone testified that she received approximately $ 70,000 in cash gifts from her father, Robert Canfield, between 1972 or 1973 and 1986 or 1987. Mr. Canfield died on October 2, 1989. Mr. Canfield had been a captain in the fire department and acting deputy chief. He also worked at an ice cream store known as "Dairy-Isle". This was a franchise owned by Carmella Canfield, Mrs. Marrone's stepmother. The Dairy-Isle was only operated seasonally, depending on the weather, from March or April through October. Mrs. Marrone testified that she visited her father at the Dairy-Isle several times a week throughout *26 the year, except during the winter. During these visits, Mrs. Marrone claimed that her father frequently handed her plain white sealed envelopes filled with cash. The money purportedly was taken out of Mrs. Canfield's business and transferred to Mrs. Marrone without Mrs. Canfield's knowledge. Mrs. Marrone said that she did not open the envelopes and put them in her dresser drawer for a number of years. After the envelopes had started to accumulate, petitioners claimed that in 1983 they purchased a safe to store the cash. Mrs. Marrone stated that neither she nor her husband opened the envelopes until they wanted to use the money to purchase their house in 1988. Mrs. Marrone claimed the cash-filled envelopes were to be held for her four siblings and herself. She said that as a result of this case, two of her siblings knew about the cash. None of her brothers or sisters had ever requested any portion of the $ 70,000. Mrs. Marrone claimed that when she used the cash for a downpayment on petitioners' house in 1988, she was not spending the money because she planned to repay it when they sold their house in 2 years. The house was not sold in 2 years. Petitioner testified that *27 he had no idea as to how much money was in the envelopes. Petitioner claimed that he did not look in the envelopes from the time the gifts started in 1972 or 1973 until they purchased the safe in about 1983. At that time, petitioner said there were numerous envelopes. Petitioner said he counted the cash when he put it in the safe in 1983. Petitioner said that when he opened the envelopes, he counted between $ 40,000 and $ 45,000 in cash. Petitioner testified that the envelopes continued to come in until 1986 or 1987, when Mr. Canfield became ill. Mrs. Canfield testified that she never discovered any large amounts of money missing from her ice cream business. She She explained that very strict controls were in place because the Dairy-Isle was a franchise. The franchisor monitored the amount of money that each store earned. Mrs. Canfield also testified that she compared the cash register tapes with the gross receipts of the Dairy-Isle. She questioned any "no sales" that were rung on the register. As a result, Mrs. Canfield said that she was positive that it was not possible that $ 70,000 was taken from her Dairy-Isle business. On June 29, 1988, petitioners purchased their *28 house located at 707 Mapledale Drive, Utica, New York. On June 28, 1988, petitioner used $ 28,282 in cash to purchase a bank check from the Bank of Utica. The $ 28,000 bank check was used as part of the downpayment on the purchase of the house. The remaining $ 282 was a bank fee for the check. Petitioners used an additional $ 2,000 of cash to make the total downpayment of $ 30,000. They financed the $ 32,000 balance of the $ 62,000 purchase price. Petitioner testified that $ 30,000 of the $ 70,000 alleged cash hoard was used to make this downpayment. On February 5, 1990, petitioners signed a home equity loan application. Petitioners represented that all statements made in the loan application were true. They stated on their loan application that the purchase price of their home was $ 82,000 and the cash downpayment was $ 50,000. They further represented in the loan application that they had $ 96,319 of liquid assets, which consisted of $ 51,319 in checking and savings accounts, $ 5,000 in stocks and bonds, and $ 40,000 in life insurance net cash value. Petitioners' loan application did not list any cash. Petitioners borrowed money frequently during the period they purportedly *29 received cash gifts. They borrowed a total of at least $ 115,000 by obtaining 21 different loans, aside from their home mortgage and the purported cash loans. Petitioner had been granted a bankruptcy discharge on September 19, 1977. Petitioner represented that he had never been bankrupt on at least three loan applications made after the date of his bankruptcy. Two Alleged Cash Loans for a Total of $ 25,000
Petitioner testified that in early 1990 he needed cash to purchase a $ 64,000 condominium in Las Vegas, Nevada. He purchased the condominium on or about April 16, 1990. Petitioner testified that somewhere around February 1990, he borrowed $ 15,000 from his good friend Michael Leone to purchase a condominium in Las Vegas, Nevada. Petitioner and Mr. Leone were vague about the date the loan was made. The purported loan was due in 2 years or upon the sale of petitioners' home. Petitioner did not give Mr. Leone any security. Mr. Leone did not charge petitioner interest. The purported loan was not in writing. There was no promissory note. Mr. Leone testified that on August 10 and September 11, 1989, he had his wife withdraw $ 14,000 from her checking account. He told *30 his wife that he needed the money to pay bills and because his mother needed some money. He testified that he and his wife were having marital problems. He said that the purpose of the withdrawal was to get money from his wife's account into his possession. Mr. Leone said that he gave approximately $ 8,000 in cash to his mother to hold for him. Mr. Leone said petitioner asked him for a loan of $ 15,000. Mr. Leone gave petitioner that $ 8,000 and another $ 7,000, for a total of $ 15,000 in cash. He claimed he had accumulated the $ 7,000 in cash over a number of years, and kept the cash in a filing cabinet in his bedroom. Petitioner testified that in February 1990 he borrowed $ 10,000 from his very close friend Arthur Bellino to purchase a condominium in Las Vegas, Nevada. Petitioner and Mr. Bellino were vague about the date the loan was made. The purported loan was due in 2 years or upon the sale of petitioners' home. Petitioner did not give Mr. Bellino any security. Mr. Bellino did not charge petitioner interest. The purported loan was not in writing. There was no promissory note. Mr. Bellino testified that the money he lent petitioner came from $ 12,000 in cash that *31 he had accumulated between 1985 and 1990. He kept the cash in a shoebox in his home. Mr. Bellino claims that $ 2,500 of this cash accumulation came from a disability settlement in the amount of $ 7,000 he received in 1987. That settlement was paid, the check was cashed, and the proceeds were saved in his shoebox. Mr. Bellino testified that the balance of the cash that he had accumulated came from saving one-half of his wife's paychecks. Petitioner, Mr. Leone, and Mr. Bellino each testified that the respective loans were repaid by petitioner. Petitioner's check for $ 15,000 was payable to Mr. Leone, and his check for $ 10,000 was payable to Mr. Bellino. The checks drawn on petitioner's account were purportedly loan repayments and were dated January 27, 1992. Respondent's audit was in process by April 30, 1991. Petitioner had been asked by respondent to explain the sources of large cash deposits well before January 27, 1992. Alleged Cash Gift of $ 9,000
When petitioner's mother, Grace Lacata, testified, she was 77 years old and in poor health. She had retired in 1962, and her husband was deceased. She received a widow's pension of $ 43 monthly and a Social Security *32 check of about $ 648 each month. She did not own a house, any certificates of deposit, stocks, bonds, or mutual funds, and had no bank accounts. She rented a modest apartment. Mr. Marrone testified that his mother gave him $ 9,000 around March 1990. Allegedly, this $ 9,000 was virtually all of her life savings. Mrs. Lacata said that she gave her son $ 9,000 in 1990 for the purchase of a condominium in Las Vegas, Nevada. Petitioner testified that after his mother gave him the $ 9,000, she had a few dollars left, which she put back in a locked box. Petitioner testified that the $ 9,000 gift consisted of mostly $ 10 and $ 20 bills. The bills were in a thick, big, brown manila envelope. Petitioner claims that he put the envelope containing the bills in his coat pocket. Deposits of $ 52,000 in Cash
Petitioner made cash deposits into his checking account at the Bank of Utica in the amounts of $ 9,000, $ 7,000, $ 9,000, $ 9,000, $ 9,000, and $ 9,000 ($ 52,000 in total) on March 21, 22, 26, 28, 30, and April 6, 1990, respectively. Petitioner testified that he went to the bank with cash in the amount of $ 52,000, all in $ 100 bills. He said he had this $ 52,000 in two big *33 envelopes in large pockets in his overcoat. Petitioner learned he would be required to fill out many forms for the Internal Revenue Service. He also learned that this paperwork could be avoided by making deposits of less than $ 10,000 in a 24-hour period. Petitioner made six cash deposits of less than $ 10,000 each over a 16-day period for a total of $ 52,000. The Bank of Utica filed at least four Forms 4789, Currency Transaction Report, with respondent. On these four forms, the Bank of Utica reported that it received a total of $ 34,000 in cash from petitioner. The Bank reported that petitioner had deposited cash in the amounts of $ 9,000, $ 7,000, $ 9,000, and $ 9,000, on March 21, 22, 26, and 28, 1990, respectively. The information in these reports resulted in the audit which led to the issuance of the notice of deficiency by respondent in this case. Unreported Income
Respondent used the source and application of funds method to determine that petitioners had unreported income in 1988, 1989, and 1990. This method of income reconstruction has long been accepted by this Court. . This method *34 is based on the assumption that the amount by which a taxpayer's application of funds during a taxable period exceeds the taxpayer's known source of funds is taxable income, absent explanation by the taxpayer. . Petitioners bear the burden of proving that respondent's determination of petitioners' understatement of income for the 3 years in issue is incorrect. Rule 142(a); . Petitioners do not challenge respondent's use of the source and application of funds method to determine their income for the years at issue. Instead, petitioners have attempted to explain that the excess of their expenditures over their available income is from nontaxable sources. Petitioners claim that they had a cash hoard of $ 70,000 at the time they borrowed $ 32,000 for the purchase of their home. Yet their loan application failed to disclose that they had any cash. Evidence of borrowing supports an inference that petitioners did not have a cash hoard because a cash hoard negates the necessity to borrow. . *35 Petitioners claim they received this $ 70,000 from Mr. Canfield. They also allege that he took the money from his wife's Dairy-Isle business without her knowledge. Mr. Canfield died in 1989, before the petition herein was filed. Mrs. Canfield, a credible witness, testified that due to franchise controls it would have been impossible for Mr. Canfield to have taken $ 70,000 from her business. Mrs. Marrone testified that petitioners did not count the money until 1988 when they were going to take $ 30,000 of the cash hoard to buy their house. Petitioner contradicted Mrs. Marrone's testimony when he testified that he counted the money in the envelopes in 1983. He said the cash totaled between $ 40,000 and $ 45,000 at that time. We do not believe that petitioners, who allegedly received numerous envelopes containing cash over more than a decade, would not look to see how much the envelopes contained as they were received. Petitioners both claimed that, at least until 1983, they did not know how much money was in the "numerous envelopes." Yet petitioners claim they bought a safe to store the cash. Petitioners also signed loan documents which contained false statements, despite *36 their representations that all such statements were true. They did not list their purported cash hoard. Petitioner repeatedly misrepresented that he had not been in bankruptcy. Petitioners falsely inflated the purchase price of their house from $ 62,000 to $ 82,000 and the downpayment from $ 30,000 to $ 50,000. We find that petitioners' testimony is unbelievable. Based upon our review of the conflicting and inconsistent statements and other evidence in the record, we find that petitioners did not receive cash gifts in the total amount of $ 70,000 from Mr. Canfield. We find the other explanations by petitioners of their cash sources not credible. Petitioner's two longtime friends, Mr. Leone and Mr. Bellino, claimed that in February 1990 they lent petitioner cash in the amounts of $ 15,000 and $ 10,000, respectively, which took years to accumulate. They failed to document these purported loans in writing or with promissory notes, and they did not charge any interest. Although they claim these purported loans were to help petitioner purchase a condominium in Las Vegas, Nevada, they failed to secure these purported loans with the condominium or any other collateral. Mr. Leone *37 testified that he purposefully misled his wife, with whom he was having marital difficulties, into withdrawing $ 14,000 from her account so he could take her money into his possession. His testimony in that and other respects was implausible. Based on this record, we do not believe petitioner received loans from his two friends. We find that petitioner's good friends did not lend him $ 25,000 in cash. At the time she testified, Mrs. Lacata, petitioner's mother, was 77 years old, weak, and in poor health. Overall her testimony was vague, and her memory was poor. Aside from the alleged gift of $ 9,000 to petitioner, Mrs. Lacata had little in the way of economic resources. Mrs. Lacata has been retired since 1962. Mrs. Lacata testified that nobody knew that she had cash of $ 9,000 in a locked box. But she contradicted herself when she testified that her son, Leonard, closed a bank account on her behalf, withdrew approximately $ 9,000 in cash, and gave her that $ 9,000 in cash, which she put in the box. Mrs. Lacata said the $ 9,000 was in $ 5, $ 10, and $ 20 bills in one brown envelope. From time to time, she would take about $ 20 out of the box when she needed money. Sometimes *38 she took more for her needs. She would occasionally put a few dollars at a time in the box, which came from her Social Security checks. Aside from the $ 52,000 in large cash deposits described above, from January 1990 until petitioner wrote the check to purchase the $ 64,000 condominium, petitioners had at least $ 51,000 in their checking and savings accounts. At the time he wrote the check for the condominium, petitioners' checking account had a balance of $ 112,006.38. Under the circumstances, we do not believe that, around March 1990, petitioner asked his ailing mother to give up her alleged life savings, leaving her with a few dollars in the box. On this record, we find that petitioner did not receive a cash gift of $ 9,000 from his mother. Petitioners claimed on brief that all of petitioners' witnesses "proved to be intelligent, articulate people who if they chose to lie could have easily concocted a better story that would have been more believable than the story they told the Court." Petitioners therefore contend that the story told to the Court was true. We find that their story is unbelievable, and that the story they "concocted" is not true. This finding is based *39 in part upon the testimony of petitioners and their witnesses. Our evaluation of their testimony is founded upon "the ultimate task of a trier of the facts -- the distillation of truth from falsehood which is the daily grist of judicial life." . Except for respondent's concession, we sustain respondent's determination as to the amounts of unreported income for each of the 3 years in issue. Additions to Tax for Fraud
We turn to the question of whether petitioners are liable for the additions to tax for fraud. For 1988, section 6653(b)(1) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud. Similarly, for 1989 and 1990, section 6663(a) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud. The Commissioner bears the burden to prove fraud by clear *40 and convincing evidence. Sec. 7454(a); Rule 142(b); . The Commissioner must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. . When fraud is determined for more than one taxable year, the Commissioner must show that an underpayment exists and that some part of the underpayment was due to fraud for each year. . The existence of fraud is a factual question to be determined upon a consideration of the entire record. . Fraud is never presumed but must be established by clear and convincing evidence. Id. Because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence. , affd. without published opinion . *41 Fraud may be properly inferred where a taxpayer's entire course of conduct establishes the requisite fraudulent intent. . Courts have relied on a number of indicia of fraud when they decide civil tax fraud cases. . Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive evidence. Id. These indicia or badges of fraud include: (1) Understating income, (2) maintaining inadequate records, (3) giving implausible or inconsistent explanations of behavior, and (4) dealing in cash. . The mere failure to report income is not sufficient to establish fraud. . Consistent and substantial understatements of large amounts of taxable income over a period of years have been held to be strong evidence of fraud. . Respondent has shown the existence *42 of indicia of fraud. Petitioners underreported their income for the years at issue in the amounts of $ 40,588, $ 9,632, and $ 59,192 for 1988, 1989, and 1990, respectively. These amounts are substantial when compared to their reported total income of $ 51,097.32, $ 50,906.19, and $ 60,197.67 for the years 1988, 1989, and 1990, respectively. Such a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. . In addition to the consistent pattern of substantial understatements, petitioners and their purported lenders maintained inadequate records to document the purported loans. Petitioners' explanations were implausible and inconsistent. Petitioners' witnesses were not credible. Petitioners' story was concocted. Petitioners dealt in a substantial amount of cash. These factors are additional indicia of fraud. Another indicium of fraud is the fact that petitioner intentionally made cash deposits, within days of each other, in amounts less than $ 10,000, to avoid the Federal currency transaction reporting requirements. . *43 Respondent may prove underpayments of income by proving a likely source of the unreported income. . Alternatively, where the taxpayer alleges nontaxable sources, respondent may satisfy her burden by disproving the alleged nontaxable sources. ; , affd. . The Second Circuit is the circuit to which an appeal in this case would lie. In the instant case, we find that respondent disproved all petitioners' alleged nontaxable sources of income.
In sum, we conclude that respondent has shown by clear and convincing evidence that all of petitioners' underpayments of tax in the 3 years at issue are due to fraud. Accordingly, we sustain respondent's imposition of the additions to tax for fraud under section 6653(b)(1) for 1988, and under section 6663(a) for 1989 and 1990. Section 6661(a) Addition to Tax
For 1988, section 6661(a) imposes an addition to tax equal to 25 percent of the amount of underpayment which is *44 due to a substantial understatement of income tax. There is a substantial understatement of income tax if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. . We find that petitioners had such an understatement in 1988. Therefore, we sustain respondent's determination as to this issue. Decision will be entered under Rule 155.